ACCEPTED
02-17-00252-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
12/20/2017 7:03 PM
DEBRA SPISAK
CLERK

NO. 02-17-00252-CV

# In The Second Court Of Appeals
# Fort Worth, Texas

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS

12/20/2017 7:03:52 PM

DEBRA SPISAK
Clerk

LANTEK COMMUNICATIONS, INC., et al.,

*Appellant-Cross Appellee*

v.

HAMILTON PECK,

*Appellee-Cross Appellant.*

From the 141st Judicial District Court, Tarrant County, Texas
Honorable John P. Chupp presiding, Cause No. 141-286694-16

## BRIEF OF APPELLEE-CROSS APPELLANT HAMILTON PECK

**KATHERINE ELRICH**
Texas Bar No. 24007158
kelrich@cobbmartinez.com

**KELLY B. GIBBONS**
Texas Bar No. 24055548
kgibbons@cobbmartinez.com

**COBB MARTINEZ WOODWARD PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
(214) 220-5200
(214) 220-5299 (Fax)

—and—

**JOHN W. BOWDICH**
Texas Bar No. 00796233
jbowdich@bowdichlaw.com

**BOWDICH & ASSOCIATES, PLLC**
10440 N. Central Expy., Suite 1540
Dallas, Texas 75231
(214) 307-9500 Telephone
(214) 307-5137 Facsimile

**ATTORNEYS FOR APPELLEE-CROSS APPELLANT HAMILTON PECK**

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

| *PARTY* | *COUNSEL* |
| --- | --- |
| Lantek Communications, Appellant-Cross Appellee<br><br>Lantek Communications II, LLC, Lantek Audio Video Communications, LLC, Domingo Mayorga, and Ester Mayorga, Cross Appellees | Byron Henry<br>byron.henry@solidcounsel.com<br>Andrea K. Bouressa<br>andrea.bouressa@solidcounsel.com<br>Scheef & Stone, L.L.P.<br>2600 Network Boulevard, Suite 400<br>Frisco, Texas 75034<br>214.472.2100 Telephone<br>214.472.2150 Facsimile<br>(appellate counsel)<br><br>Christopher Vickers<br>cvickers@vickerslaw.net<br>Vickers Kempf, PLLC<br>6508 Colleyville Blvd., Suite 100<br>Colleyville, Texas 76034<br>817.421.3961 Telephone<br>817.251.0505 Facsimile<br>(trial counsel) |

| PARTY | COUNSEL |
|---|---|
| Hamilton Peck,<br>    Appellees-Cross Appellant | Katherine K. Elrich<br>kelrich@cobbmartinez.com<br>Kelly B. Gibbons<br>kgibbons@cobbmartinez.com<br>Cobb Martinez Woodward PLLC<br>1700 Pacific Avenue, Suite 3100<br>Dallas, Texas 75201<br>214.220.5200 Telephone<br>214.220.5299 Facsimile<br>(appellate counsel)<br><br>John W. Bowdich<br>Texas Bar No. 00796233<br>jbowdich@bowdichlaw.com<br>Bowdich & Associates, PLLC<br>10440 N. Central Expy., Suite 1540<br>Dallas, Texas 75231<br>214.307.9500 Telephone<br>214.307.5137 Facsimile<br>(trial and appellate counsel) |

# TABLE OF CONTENTS

**Page (s)**

IDENTITY OF PARTIES AND COUNSEL ............................................................2

TABLE OF CONTENTS...................................................................................4

INDEX OF AUTHORITIES.............................................................................7

STATEMENT OF THE CASE..........................................................................12

STATEMENT REGARDING ORAL ARGUMENT ..........................................13

ISSUES PRESENTED.....................................................................................14

RECORD REFERENCES ...............................................................................15

INTRODUCTION ..........................................................................................16

STATEMENT OF FACTS ...............................................................................16

    A.    Hamilton Peck's shareholder dispute against Lantek. ........................16

    B.    The Settlement Agreement...............................................................17

    C.    Lantek's award of the Phase 3 Subcontract. ......................................18

    D.    Lantek refused to pay Peck for the full Phase 3 scope of work. ..........................................................................................22

    E.    Further litigation ensued based on the interpretation of the Settlement Agreement. ..................................................................23

    F.    The trial court agreed with Peck's interpretation of the Settlement Agreement and granted summary judgment in favor of Peck. ..................................................................................24

SUMMARY OF THE ARGUMENT ................................................................25

APPELLEE'S ARGUMENT IN RESPONSE TO APPELLANT'S CHALLENGE ................................................................................................26

    A.    Standard of Review. .......................................................................26

    B.    The trial court correctly awarded Peck summary judgment on his breach of contract claim and correctly denied Lantek's request for summary judgment on its declaratory judgment action. ..........................................................................................28

        1.    Texas law on general contract interpretation...........................29

        2.    Law regarding integration of agreements. ...............................30

3. The writings constituting the agreements at issue here. ..............................................................31

    a. The Phase 3 Subcontract language. ................................33

    b. The Settlement Agreement language ..............................35

4. Headings do not control. The substance of the provision is controlling. ...........................................37

5. Surrounding circumstances may be considered. ........................39

6. Peck's interpretation does not treat the exclusion of change order language as mere surplusage. .............................47

C. The trial court correctly awarded Peck his attorney's fees under Chapter 38. ..............................................................50

CROSS-APPELLANT'S ARGUMENT ..............................................................53

A. The trial court erred in granting the Lantek Parties summary judgment on Peck's fraud claims. ...........................................53

1. Standard of Review. ..............................................................55

2. Peck's counterclaims for Fraud and Fraud in the Inducement. ..............................................................55

    a. The Lantek Parties made a material misrepresentation to Peck. ..............................................................56

    b. The misrepresentation was false. ..............................................................58

    c. When the Lantek Parties made the representation, they knew the representation was false or made the representation recklessly without any knowledge of the truth and as a positive assertion. ..............................................................59

    d. The Lantek Parties intended Peck to act upon its misrepresentations. ..............................................................60

    e. Peck justifiably relied on the Lantek Parties' misrepresentations. ..............................................................62

    f. Peck was injured as a result of the Lantek Parties' misrepresentations. ..............................................................65

3. Peck's counterclaims for Fraud by Nondisclosure. ...................66

    a. The Lantek Parties deliberately failed to disclose material facts to Peck. ..............................................................68

b.   The Lantek Parties had a duty to disclose material facts to Peck. ..................................................68

c.   The Lantek Parties failed to disclose material facts to Peck, who was ignorant of the facts and did not have an equal opportunity to discover them. ...................69

d.   The Lantek Parties intended Peck to act or to refrain from acting. ...................................................70

e.   Peck relied on the Lantek Parties' nondisclosure and was injured. ............................................71

CONCLUSION AND PRAYER ........................................................71

RULE 9.4 CERTIFICATE OF COMPLIANCE ....................................74

CERTIFICATE OF SERVICE ...........................................................74

6

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*,
192 S.W.3d 20 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied)........................................................................................................62

*Barrett v. Ferrell*,
550 S.W.2d 138 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.).......................41

*Burleson State Bank v. Plunkett*,
27 S.W.3d 605 (Tex. App.—Waco 2000, pet. denied).....................................57

*Byrd v. Smyth*,
590 S.W.2d 772 (Tex. Civ. App.—El Paso 1979, no writ)...............................41

*Cantey Hanger, LLP v. Byrd*,
467 S.W.3d 477 (Tex. 2015) .....................................................................26, 63

*Chase Manhattan Bank v. First Marion Bank*,
437 F.2d 1040 (5th Cir. 1971) ...................................................................40, 41

*Citizens Nat'l Bank v. Allen Rae Invs., Inc.*,
142 S.W.3d 459 (Tex. App.—Fort Worth 2004, no pet.).................................68

*City of Fort Worth v. Gene Hill Equipment Co.*,
761 S.W.2d 816 (Tex. App.—Fort Worth 1988, no writ).................................42

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) .....................................................................27, 28

*Coastal Bank SSB v. Chase Bank of Tex., N.A.*,
135 S.W.3d 840 (Tex. App.—Houston [1st Dist.] no pet.).............................62

*Coker v. Coker*,
650 S.W.2d 391 (Tex. 1983) ........................................................................49

*Cook Composites, Inc. v. Westlake Styrene Corp.*,
15 S.W.3d 124 (Tex. App.—Houston [14th Dist.] 2000, pet.
dism'd) ...................................................................................................40

*Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Trust*,
383 S.W.3d 581 (Tex. App.—Houston [14th Dist.] 2012, pet.
denied)....................................................................................................40

*Crossland Acquisition, Inc. v. HNTB Corp.*,
2016 Tex. App. LEXIS 8855 (Tex. App.—Houston [14th Dist.],
Aug. 16, 2016, pet. denied)....................................................................39

*Enter. Leasing Co. v. Barrios*,
156 S.W.3d 547 (Tex. 2004) ...........................................................37, 38

*Exxon Corp. v. Emerald Oil & Gas Co.*,
348 S.W.3d 194 (Tex. 2011) ..................................................................56

*Forbau v. Aetna Life Ins. Co.*,
876 S.W.2d 132 (Tex. 1994) (op. on reh'g) .....................................27, 29

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*,
960 S.W.2d 41 (Tex. 1998)......................................................................60

*Grant Thornton LLP v. Prospect High Income Fund*,
314 S.W.3d 913 (Tex. 2010) ...................................................................62

*Hannon, Inc. v. Scott*,
2011 Tex. App. LEXIS 3624 (Tex. App.—Fort Worth, May 12,
2011, pet. denied)..............................................................................56, 63

*Hasse v. Glazner*,
62 S.W.3d 795 (Tex. 2001).......................................................................56

*ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*,
234 S.W.3d 711 (Tex. App.—Eastland 2007, no pet.).............................30

*KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*,
746 S.W.2d 238 (Tex. App.—Houston [1st Dist.] 1987, writ
denied)....................................................................................................39

8

*LeBlanc v. Riley*,
  2009 Tex. App. LEXIS 2204 (Tex. App.—Fort Worth April 2,
  2009, no pet.) ...................................................................................................52

*Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*,
  925 S.W.2d 565 (Tex. 1996) ...........................................................................29

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*,
  289 S.W.3d 844 (Tex. 2009) ...........................................................................26

*McCamish v. F.E. Appling Interests*,
  991 S.W.2d 787 (Tex. 1999) ...........................................................................62

*Merriman v. XTO Energy, Inc.*,
  407 S.W.3d 244 (Tex. 2013) .....................................................................26, 67

*Miller v. Kennedy & Minshew, Prof'l Corp.*,
  142 S.W.3d 325 (Tex. App.—Fort Worth 2003, pet. denied).....................56, 62

*Moreau v. Otis Elevator Co.*,
  531 F.2d 311 (5th Cir. 1976) ...........................................................................42

*Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.*,
  249 S.W.3d 480 (Tex. App.—Beaumont 2008, no pet.) ...................................31

*Ogden v. Dickinson State Bank*,
  662 S.W.2d 330 (Tex. 1983) ...........................................................................30

*Phillips v. Inexco Oil Co.*,
  540 S.W.2d 546 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.).....................29

*Plains Expl. & Prod. Co. v. Torch Energy Advisors, Inc.*,
  473 S.W.3d 296 (Tex. 2005) ...........................................................................39

*Portland Gasoline Co. v. Superior Mktg. Co.*,
  243 S.W.2d 823 (Tex. 1951) (overruled on other grounds) .............................30

*Reservoir Sys. v. TGS-NOPEC Geophysical Co., L.P.*,
  335 S.W.3d 297 (Tex. App.—Houston [14th Dist.] 2010, pet.
  denied)..............................................................................................................57

*Robertson v. Home State County Mutual Ins. Co.*,
  348 S.W.3d 273 (Tex. App.—Fort Worth 2011, pet. denied) (en
  banc)......................................................................................29, 30

*Royal Indem. Co. v. Marshall*,
  378 S.W.2d 364 (Tex. Civ. App.—Austin 1964), *rev'd on other
  grounds*, 388 S.W.2d 176 (Tex. 1965) ...............................................40

*RSI Int'l, I v. CTC Transp., Inc.*,
  291 S.W.3d 104 (Tex. App.—Fort Worth 2009, no pet.)....................27

*RSUI Indem. Co. v. Lynd Co.*,
  466 S.W.3d 113 (Tex. 2015) ............................................................37

*Schlumberger Tech. Corp. v. Swanson*,
  959 S.W.2d 171 (Tex. 1997) ............................................................67

*Seagull Energy E&P, Inc. v. Eland Energy, Inc.*,
  207 S.W.3d 342 (Tex. 2006) ............................................................26

*Smart v. Tower Land & Inv. Co.*,
  597 S.W.2d 333 (Tex. 1980) ............................................................30

*Spoljaric v. Percival Tours, Inc.*,
  708 S.W.2d 432 (Tex. 1986) .................................................60, 67, 70

*Stine v. Stewart*,
  80 S.W.3d 586 (Tex. 2002) (per curiam).........................................26

*Sun Oil Co. v. Madeley*,
  626 S.W.2d 726 (Tex. 1981) ............................................................39

*Tawes v. Barnes*,
  340 S.W.3d 419 (Tex. 2011) ......................................................26, 27

*Timpte Indus. v. Gish*,
  286 S.W.3d 306 (Tex. 2009) ............................................................27

*Trenholm v. Ratcliff*,
  646 S.W.2d 927 (Tex. 1983) ............................................................56

**Statutes**

LOCAL GOV'T CODE §281.046(e)................................................................42

TEX. CIV. PRAC. & REM. CODE §38.001.......................................................51, 52

**Other Authorities**

David R. Dow, *The Confused State of the Parol Evidence Rule in Texas*, 355 TEX. L. REV. 457, 459 (1994).............................................31

TEX. DISC. R. OF PROF. CONDUCT 4.01 ......................................................63

RESTATEMENT (SECOND) OF CONTRACTS § 202............................................29, 40, 41

RESTATEMENT (SECOND) OF CONTRACTS § 209...........................................30

RESTATEMENT (SECOND) OF CONTRACTS § 213...........................................30

RESTATEMENT (SECOND) OF CONTRACTS § 219...........................................42

RESTATEMENT (SECOND) OF CONTRACTS § 228...........................................30

TEX. R. APP. P. 38.1 .................................................................................52

TEX. R. CIV. P. 166a...............................................................................66

## STATEMENT OF THE CASE

**Nature of the Case:** This is a breach of contract case due to Lantek Communications, Inc.'s ("Lantek") failure to pay the total amount due and owing on a settlement agreement with Hamilton Peck. (1 CR 24-119).

**Course of Proceedings:** Lantek initiated the proceedings by filing a declaratory judgment action seeking a declaration from the trial court regarding the interpretation of the parties' settlement agreement. (1 CR 6-9). Peck filed a counterclaim against the Lantek entities for breach of contract and against the Lantek entities and Domingo and Ester Mayorga ("Lantek Parties") for fraud based on Lantek's failure to pay the total amount due and owing on the parties' settlement agreement. (1 CR 40-52). Both the Lantek Parties and Peck filed amended pleadings but the gist of their dispute remained the same. (1 CR 24-39, 124-126, 197-218, 219-297; 3 CR 1335-1417). Both sides moved for summary judgment. (1 CR 127-196, 724-1018, 2 CR 1025-1054).

**Trial Court:** The Honorable John P. Chupp, 141st Judicial District Court, Tarrant County, Texas.

**Trial Court Disposition:** The trial court denied Lantek's motion for summary judgment on its interpretation of the settlement agreement, granted summary judgment in favor of Peck on his breach of contract claim and granted summary judgment in favor of the Lantek Parties on Peck's fraud counterclaims. (1 CR 723, 4 CR 1826-1828). The parties stipulated to the amount of damages and attorney's fees. (4 CR 1829-1831). On June 20, 2017, the trial court entered a final judgment in favor of Peck and against Lantek in the amount of $547,529.65, less $40,215.50 for payments Peck previously received. (4 CR 1832-1834). The trial court also awarded the stipulated amount of attorney's fees, prejudgment interest, post-judgment interest, and court costs. (4 CR 1833-1834).

12

## STATEMENT REGARDING ORAL ARGUMENT

Hamilton Peck respectfully requests that this Court set this appeal for oral argument. This appeal concerns whether the trial court properly granted summary judgment in favor of Hamilton Peck and properly denied Lantek summary judgment on Lantek's failure to pay the full amount due and owing to Peck on the parties' settlement agreement, as well as whether the trial court erred in granting the Lantek Parties' no-evidence motion for summary judgment on Peck's fraud claims. Oral argument would help clarify for this Court why Peck's interpretation is the only reasonable interpretation of the settlement and, alternatively, how the Lantek Parties committed fraud.

# ISSUES PRESENTED

1.   *Lantek's Appellant's Issues Re-stated:*

   a.   The trial court correctly granted summary judgment in favor of Hamilton Peck for Lantek's breach of the settlement agreement and correctly denied summary judgment in favor of Lantek because the unambiguous language of the settlement agreement required Peck to be paid 10% of the original scope of work contemplated in a phase 3 subcontract of the DFW Terminal B Project (up to a maximum of $1,000,000.00).

   b.   Alternatively, if the language in the settlement agreement is ambiguous, this Court should reverse and remand rather than reverse and render as Lantek's interpretation of the contractual provision at issue is not a reasonable interpretation to permit this court to reverse and render a decision.

   c.   If the Court affirms the trial court's judgment on Peck's breach of settlement agreement claim, Peck is entitled to his attorney's fees under Chapter 38 and as stipulated by the parties.

2.   *Peck's Cross-Appellant's Issue:*

   a.   If this Court were to hold that the trial court erred in granting summary judgment in favor of Peck on his breach of settlement agreement claim, then the trial court also erred in granting the Lantek Parties' summary judgment on Peck's fraud counterclaims because: (1) the Lantek Parties never challenged Peck's fraud by non-disclosure counterclaim in its no-evidence motion for summary judgment, and (2) there was sufficient evidence in the record to raise a genuine issue of material fact on each of the challenged elements of all of Peck's fraud counterclaims.

## RECORD REFERENCES

The record on appeal consists of a four-volume Clerk's Record and a one-volume Reporter's Record. The Clerk's Record will be cited "(__ CR __)." The Reporter's Record will be cited as "(RR __)."

## INTRODUCTION

The central issue on appeal is whether the trial court properly granted summary judgment in favor of Hamilton Peck and properly denied Lantek's request for summary judgment on Lantek's failure to pay the full amount due and owing to Peck based on the parties' settlement agreement.

## STATEMENT OF FACTS

**A.    Hamilton Peck's shareholder dispute against Lantek.**

Hamilton Peck was a founding shareholder of Lantek, a design/build contractor for audio/visual system integration and structured cablings.  Sometime in late 2012, Peck's business relationship with the company and its co-founder, Domingo Mayorga, deteriorated.  (4 CR 1678-1687).  Peck was ultimately forced to sue Lantek and Mayorga for breach of contract, breach of fiduciary duties, breach of corporate trust and claim for malicious suppression of dividends, violation of the Texas Business Organizations Code, accounting, fraud and negligent misrepresentation – all stemming from Mayorga's conduct related to Lantek and Peck's 50% ownership in Lantek at the time. (4 CR 1679).  After protracted litigation, mediation and continued settlement negotiations, the parties entered into a Rule 11 Settlement Agreement ("the Settlement Agreement").  (4 CR 1070-1077, 1679, 1688-1697).

**B.    The Settlement Agreement.**

The Settlement Agreement provided that the Lantek Parties would pay Peck the amount of $5,000,000 in exchange for Peck's ownership in Lantek based on Lantek's value at the time, as well as provide Peck with an additional conditional payment of up to $1,000,000. (3 CR 1070, 4 CR 1679). This conditional payment was included in the Settlement Agreement to compensate Peck for the expected profits from a third phase of an entire project Peck procured for Lantek prior to Peck's resignation from Lantek. (4 CR 1679-1681).

More specifically, Peck procured the DFW Terminal B Project in 2011 and 2012 when he was running Lantek's business and sales operations. (4 CR 1681). The DFW Terminal B Project was divided into and contracted out in three phases. (3 CR 1041, 4 CR 1681-1682). While Peck procured the rights to all three phases for Lantek, he resigned during Phase 1 and was not an employee of Lantek for either Phase 2 or Phase 3. (4 CR 1681-1682). The amounts awarded under Phase 1 and Phase 2 of the DFW Terminal B Project were reflected in the value of the company, for which Peck was compensated in selling his 50% interest under Section 1 of the Settlement Agreement. (3 CR 1070-1071, 4 CR 1679-1687). Section 2 of the Settlement Agreement included a conditional payment to Peck for the expected profits from Phase 3 of the DFW Terminal B Project. (3 CR 1070, 4 CR 1679, 1689-1690).

More specifically, Section 2 provided that should Lantek receive the Phase 3 contract as anticipated based on the initial award of the DFW Terminal B Project, Peck was entitled to a conditional payment to compensate Peck for the increased value of Lantek as a result of the Phase 3 contract, as well as to compensate Peck for his previous efforts in procuring the DFW Terminal B Project. (4 CR 1679). The amount of the conditional payment in the Settlement Agreement, as shown by its terms and the circumstances surrounding the settlement, was 10% of the original (also known as "base") scope of work for Phase 3 that was performed by Lantek, which was described as the "initial contract price" of the Phase 3 contract. (4 CR 1679). Specifically, the parties agreed:

> 2) Lantek agrees to an additional conditional payment to Peck of up to $1,000,000 provided that Lantek and/or Lantek II, or any company owned in whole or in part by Ester Mayorga, Domingo Mayorga, Lantek or Lantek II receive a contract for Phase 3 of the DFW Terminal B Project. Further terms are as follows:
>
> a) The scope of work defined in Phase 3A through 3C on the bid documents dated 6/30/2011 (attached) encompass the anticipated Phase 3 contract anticipated to be awarded by DFW in 2016 or 2017.
>
> b) 10% of the initial contract price (including all base contract(s) for the scope of work defined above, but excluding all change orders) awarded to Lantek and/or Lantek II, or any company owned in whole or in part by Ester Mayorga, Domingo Mayorga, Lantek or Lantek II, for work to be performed directly by such companies, for the DFW Terminal B Phase 3 contract shall to be paid to Peck - up to a maximum of $1,000,000.

(4 CR 1679).

## C.     Lantek's award of the Phase 3 Subcontract.

As anticipated, Lantek ultimately procured a subcontract for Phase 3 of the DFW Terminal B Project from the general contractor, Manhattan Construction Company/MBJ3 ("Phase 3 Subcontract"). (3 CR 1079-1126). The "Project Scope

18

of Work" provision in the Phase 3 Subcontract coincides with the scope of work described in Section 2(a) of the Settlement Agreement. (2 CR 329-330, 393-394, 396, 500, 502, 3 CR 1070, 1111-1126).

The Phase 3 Subcontract defines the "scope of work" to be performed by Lantek as the work set out in Exhibit A to the Phase 3 Subcontract. (2 CR 329, 393-394, 3 CR 1087, 1110-1126). Additionally, the Phase 3 Subcontract explains the payment for this Phase 3 work. (3 CR 1086, 1121-1125). While Section B of the Phase 3 Subcontract provides for a subcontract amount of $402,155, Section B also states that this amount is "subject to additions and deductions for the changes agreed upon in writing as hereinafter set forth or as otherwise authorized hereinafter." (3 CR 1086). Further, the Phase 3 Subcontract defines the $402,155 amount as a "Partial Funding" or "Early Start Enabling" amount. (3 CR 1121).

**EARLY START ENABLING**
A portion of the contract values anticipated for SA13-Terminal B-Phase 3 for the communications scope of work. This partial amount is in an effort to achieve an early start for enabling activities in Phase 3. These activities include BIM work, Demolition, and Make Safe.

**Subcontract Amount: Early Start Enabling (Partial Funding)**                    $402,155

(3 CR 1121). In fact, the Phase 3 Subcontract includes two further sections describing the remainder of the subcontract price for the original scope of work – both a Guaranteed Maximum Price (GMP) section for the scope of work in the sum of $9,190,545, which includes a General Conditions section with a Guaranteed

19

Maximum Price (GMP) in the sum of $1,400,915. (3 CR 1121). Specifically, the

Guaranteed Maximum Price Contract clause provides:

**GUARANTEED MAXIMUM PRICE CONTRACT**
The sum of the Cost of Work and the Subcontractor's fee is guaranteed by this subcontract not to exceed **$9,190,545** for Phase 3 of Terminal B, subject to additions and deductions by Change Order, as provided in the Contract Documents. Such maximum price is referred to in the Contract Documents as the Guaranteed Maximum Price. A Change Order will be issued when CMAR receives GMP for the difference between the GMP and the Enabling Package Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Subcontractor without reimbursement by the Contractor.

Note: Pricing is based on 100% IFC construction documents (drawings and specifications) dated April 9, 2014 and DCN# 1,DCN#2 and DCN#3.

(3 CR 1121). The General Conditions GMP Phase 3 provision states:

**GENERAL CONDITIONS GMP Phase 3:**
General Conditions are included as a separate GMP **(not a line item GMP)** in the amount of $1,400,915 within the total GMP proposal. General Conditions include all staff, field office trailer, supplies and overhead and profit. General conditions will be billed against the following breakdowns, and will not exceed $ 1,400,915. Final rates and burdens will be based on supported and actual costs as approved by Owner. All rates shall remain the same for all phases of the Project.

The Project Scope of Work – Communications (Exhibit "A" to Phase 3 Subcontract), Section 4, "Recap of Contract Amount" includes a spreadsheet with the breakdown of the GMP of $1,400,915 for General Conditions for Phase 3, and GMP of $9,190,545 for the Phase 3 Scope of Work. (3 CR 1122-1125). The GMP of $9.1 million is the total initial contract price for Lantek's scope of work for Phase 3 of the DFW Terminal B Project pursuant to the Phase 3 Subcontract. (1 CR 393-394; 3 CR 1081).

The Phase 3 Subcontract defines "Early Start Enabling" as a "*portion* of the values anticipated . . . for the communications scope of work" for the purpose of

achieving "an early start for enabling activities in Phase 3." (3 CR 1121) (emphasis added). The immediately-following paragraphs in the Phase 3 Subcontract go on to state that the initial maximum price for the scope of work is $9,190,545 for the Guaranteed Maximum Price ("GMP"), including $1,400,915 for Phase 3 General Conditions GMP. (3 CR 1121). As shown above, the Phase 3 Subcontract noted that the GMP pricing was the price of the scope of work where it states that "[p]ricing is based on 100% IFC construction documents (drawings and specifications) dated April 9, 2014, and DCN #1, DCN #2, DCN #3."[1] (3 CR 1121). Moreover, the proposal documents show a total Phase 3 pricing of $9,190,545.47. (4 CR 1613).

The Settlement Agreement stated that Peck would receive "10% of the 'initial contract price (including *all* base contract(s) *for the scope of work defined above. . .*'") in Section 2(b). (3 CR 1070) (emphasis added). The scope of work in the Settlement Agreement is defined as follows in Section 2(a):

> a) The scope of work defined in Phase 3A through 3C on the bid documents dated 6/30/2011 (attached) encompass the anticipated Phase 3 contract anticipated to be awarded by DFW in 2016 or 2017.

---

[1] The term "100% IFC ("Issued for Construction") documents and DCN #1, DCN #2, DCN #3 ("Design Change Notices")" comprise the initial scope of work set out in Exhibit "A" to the Phase 3 Subcontract and coincides with section 2(a) of the Settlement Agreement. (1 CR 393-394; 2 CR 503, 3 CR 1070, 1111-1126).

(3 CR 1070). The Phase 3 Subcontract confirms that the price for the scope of work is $9,190,545 when it links the price back to the scope of work by stating the following:

> Note: Pricing is based on 100% IFC construction documents (drawings and specifications) dated April 9, 2014 and DCN# 1,DCN#2 and DCN#3.

(3 CR 1121). Of the full contract price for the original scope of work, Lantek's subcontractors (Vanguard Electrical, Siemens, and Ford AV) performed $3,564,891.54 for 100% of IFC, as well as $43,602.50 for DCN #1 and $16,104.06 for DCN #3, leaving the portion directly performed by Lantek as $5,565,946.90. (3 CR 1123-1126). Pursuant to the Settlement Agreement, Lantek was required to pay Peck 10% of that amount, or $556,594.69.

**D.    Lantek refused to pay Peck for the full Phase 3 scope of work.**

Lantek paid Peck on a fraction of what was owed to Peck under the Settlement Agreement for the Phase 3 scope of work. *See* App.'s Br. at 12; *see also* (4 CR 1829). More specifically, Lantek paid Peck 10% of the $402,155, "Early Start Enabling" or partial funding amount. *Id.* Lantek justified its decision based on a scheme devised by Lantek to modify the Settlement Agreement in such a way to attempt at shielding the bulk of the funds awarded for the Phase 3 work. (4 CR 1678-87). With full knowledge that the bulk of the amount due on the Subcontract would be broken out into a document entitled "change order," Lantek attempted to exclude all "change orders" from the Settlement Agreement. (4 CR 1689-1725).

22

But Lantek's attempt failed. Although Lantek modified the parties' Settlement Agreement to exclude change orders from payment, the Settlement Agreement still allows for Peck's full payment based on the Settlement Agreement's scope of work reference, the integrated language of the Phase 3 Subcontract, and the industry meaning of change order.

**E.**     **Further litigation ensued based on the interpretation of the Settlement Agreement.**

On July 26, 2016, Lantek initiated this lawsuit seeking a declaratory judgment to interpret the contractual provisions in the Settlement Agreement. (1 CR 6-21). Peck answered and also pled counterclaims for affirmative relief for breach of contract, fraud, exemplary damages and Chapter 38 attorney's fees. (1 CR 22-23, 219-297). The Lantek Parties and Peck filed multiple amended pleadings but the gist of the dispute remained the same. (1 CR 24-39, 124-126, 197-218, 219-297, 3 CR 1055-1068, 1335-1417, 4 CR 1742-1825). The parties disputed the meaning of Section 2 of the Settlement Agreement and whether the Lantek Parties committed fraud in negotiating the Settlement Agreement. Lantek initially sought partial summary judgment on its declaratory judgment action concerning its interpretation of the Settlement Agreement. (1 CR 127-196). On March 30, 2017, the trial court denied Lantek's request for partial summary judgment. (1 CR 723). Both sides filed subsequent motions for summary judgment, which the trial court heard on May 11, 2017. (2 CR 724-1018, 3 CR 1025-1054; RR 1-93).

23

**F.    The trial court agreed with Peck's interpretation of the Settlement Agreement and granted summary judgment in favor of Peck.**

On May 12, 2017, the trial court granted Peck's traditional motion for summary judgment on Peck's breach of contract counterclaim and no-evidence motions for summary judgment on Lantek's affirmative defenses. (4 CR 1826-1827). The court also granted the Lantek Parties' traditional and no-evidence motions for summary judgment on Peck's fraud counterclaims. (4 CR 1828). The parties then entered into a Stipulation and Rule 11 Agreement stipulating to the damages and attorney's fees based on the trial court's rulings on the summary judgment. (4 CR 1829-1831). The parties stipulated that Peck's actual and total damages for his breach of contract claim against Lantek are $547,529.65[2] less the $40,215.50 previously paid to Peck for a total net damages of $507,314.15. (4 CR 1829). The parties also stipulated to trial attorney's fees of $111,428.50 through the date of judgment, along with additional amounts due for court costs and interest and conditional amounts for post-judgment and appellate work. (4 CR 1829-1830). On June 30, 2017, the trial court entered a Final Judgment. (4 CR 1832-1834). Both Lantek and Peck filed notices of appeal. (4 CR 1841-1845).

---

[2] After the trial court granted summary judgment, the parties did not wish to litigate the amount due and owing to Peck based on 10% of the $9.1 million Phase 3 Subcontract. (4 CR 1829). Although the total due to Peck was $556,594.69 based on 10% of the work directly performed by Lantek under the Phase 3 Subcontract, the parties reached an agreement and stipulated that Lantek would pay Peck a total of $547,529.65 for his damages for Lantek's breach of the settlement agreement. (4 CR 1829); *see also supra* section C at p. 22.

## SUMMARY OF THE ARGUMENT

Lantek takes an unjustifiably over-simplified approach to interpreting the Settlement Agreement, ignoring provisions in the agreement leading to an unreasonable and absurd result. The trial court understood this and properly reviewed the entire agreement to give effect to the true intention of the parties as expressed in the Settlement Agreement in awarding Peck summary judgment on his breach of contract claim. This Court should reach the same conclusion as the trial court based on long-standing rules of contract interpretation and affirm the trial court's award of summary judgment in favor of Peck and affirm the trial court's denial of summary judgment for Lantek.

However, if this Court were to somehow find that the Settlement Agreement is ambiguous or that Lantek's interpretation is correct and reverse the trial court's summary judgment on the breach of Settlement Agreement, Peck seeks a reversal of the trial court's order granting the Lantek Parties' summary judgment on Peck's fraud counterclaims. Peck presented sufficient evidence to raise a fact question on each element of his fraud counterclaims showing that they committed fraud to induce Peck to agree to the modifications in the Settlement Agreement that attempt to shield Lantek from paying 10% on the entire original scope of work. Thus, the trial court's order granting summary judgment on Peck's fraud counterclaims should be reversed and remanded.

## APPELLEE'S ARGUMENT IN RESPONSE TO APPELLANT'S CHALLENGE

### A.    Standard of Review.

This Court reviews the trial court's award of a traditional summary judgment under a *de novo* standard of review and a no-evidence summary judgment under the same legal sufficiency standard as directed verdicts. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (traditional summary judgment); *Merriman v. XTO Energy, Inc.,* 407 S.W.3d 244, 248 (Tex. 2013) (no-evidence summary judgment). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The reviewing court should render the judgment that the trial court should have rendered. *Id.*

Additionally, the construction of an unambiguous contract is a question of law for the court, which should also be considered under a *de novo* standard of review. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). "When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Id*. (citing *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam)). "No single provision taken alone

will be given controlling effect; rather, all provisions must be considered in reference to the whole instrument." *Tawes*, 340 S.W.3d at 425 (citation omitted). Even if the parties differ on the interpretation of a contract, it does not follow that the contract is ambiguous. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-134 (Tex. 1994) (op. on reh'g); *see also see also RSI Int'l, I v. CTC Transp., Inc.*, 291 S.W.3d 104, 107 (Tex. App.—Fort Worth 2009, no pet.) (holding unambiguous a coinsurance provision). Furthermore, "[i]n order for an ambiguity to exist when the parties advance conflicting interpretations, both interpretations must be reasonable." *Id.* at 107.

In reviewing a no-evidence summary judgment, the appellate court must consider all other evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Timpte Indus. v. Gish,* 286 S.W.3d 306, 310 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Therefore, this Court must affirm a no-evidence summary judgment if the record shows one of the following: (1) there is no evidence on the challenged element, (2) the evidence offered to prove the challenged element is no more than a scintilla, (3) the evidence establishes the opposite of the challenged element, or (4) the court is barred by law or the rules of

27

evidence from considering the only evidence offered to prove the challenged element. *City of Keller*, 169 S.W.3d at 810.

Under these standards and as shown in more detail below, this Court must affirm the traditional summary judgment in favor of Peck because: (1) the trial court properly construed the unambiguous Settlement Agreement and determined Peck was entitled to payment on the full initial contract price awarded to Lantek under the Scope of Work section of the Phase 3 Subcontract; and (2) Lantek did not present evidence of, and did not challenge on appeal, all of the essential elements of Lantek's affirmative defenses to preclude Peck from receiving summary judgment.

**B.    The trial court correctly awarded Peck summary judgment on his breach of contract claim and correctly denied Lantek's request for summary judgment on its declaratory judgment action.**

Lantek is correct when it states that the enforceability of the Settlement Agreement is not in dispute, and the damages and attorney's fees have been stipulated by the parties. *See* App.'s Br. at 17. The parties' dispute, however, is how much Lantek owes Peck as agreed upon in the Settlement Agreement. Lantek's over-simplification of the issues and selective reliance on only portions of the agreement are completely unfounded and should be rejected by this Court, as was rejected by the trial court, based on long-standing rules of contract interpretation.

### 1. Texas law on general contract interpretation.

"In construing a written contract, [a court's] primary concern is to ascertain the true intentions of the parties as expressed in the written instrument." *Lenape Resources Corp. v. Tennessee Gas Pipeline Co*., 925 S.W.2d 565, 574 (Tex. 1996); *see also Phillips v. Inexco Oil Co*., 540 S.W.2d 546, 548-49 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.) (holding "[t]he primary concern of the courts is to ascertain and give effect to the true intention of the parties. To achieve this object the courts will examine and consider the entire writing, seeking as best they can to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless.").

The rules of contract construction and interpretation also require that courts read all parts of a contract as a whole such that "no one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions." *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-134 (Tex. 1994) (op. on reh'g); *see also Robertson v. Home State County Mutual Ins. Co.*, 348 S.W.3d 273, 277 (Tex. App.—Fort Worth 2011, pet. denied) (en banc) (upholding summary judgment on an unambiguous contract and rejecting appellant's attempt to isolate the term "domestic employees" from "not entitled to workers compensation benefits," which phrase played a "pivotal role in determining who qualified as a 'domestic employee.'"); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981).

Each part must be considered in relation to every other part so that the effect of each part on the others may be determined. *See Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 337 (Tex. 1980). Courts should harmonize those provisions that appear to be in conflict as needed to reflect the true intentions of the parties. *See Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983). Finally, a "reasonable interpretation will be preferred to an unreasonable one." *Portland Gasoline Co. v. Superior Mktg. Co.,* 243 S.W.2d 823, 824 (Tex. 1951) (overruled on other grounds); *see also Robertson*, 348 S.W.3d at 277-81 (upholding summary judgment and finding that employee's interpretation of contract terms was unreasonable).

## 2. Law regarding integration of agreements.

An agreement is "integrated" when the contracting parties adopt a writing or writings as the final and complete expression of the agreement. *See ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719 n.10 (Tex. App.—Eastland 2007, no pet.) (citing RESTATEMENT (SECOND) OF CONTRACTS § 228 (1932)). The court determines whether there is an integrated agreement before questions of interpretation or application of the parol evidence rule. *See* RESTATEMENT (SECOND) OF CONTRACTS § 209(2) (1981). But "whether a writing has been adopted as an integrated agreement is . . . to be determined in accordance with all relevant evidence." *Id.* § 209 cmt. c. & § 213 cmt. b.

30

Once a threshold determination has been made that a written contract, to some extent at least, represents an integrated agreement, the next step is to determine whether the written contract is fully or partially integrated. David R. Dow, *The Confused State of the Parol Evidence Rule in Texas*, 355 TEX. L. REV. 457, 459 (1994). A fully integrated written agreement is a "final and complete expression of all the terms agreed upon by the parties." *See Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.*, 249 S.W.3d 480, 486 (Tex. App.—Beaumont 2008, no pet.). "A partially integrated agreement is a final and complete expression of all the terms addressed in that written agreement, but is not a final and complete expression of all the terms the parties have agreed upon." *Id.* "A court considers the surrounding circumstances in determining whether, and to what degree, an agreement is integrated." *Id.*

### 3. The writings constituting the agreements at issue here.

The Settlement Agreement expressly refers to and necessarily incorporates another writing as part of the parties' agreement to supply the amount of an additional payment to Peck. More specifically, Section 2 of the Settlement Agreement provides:

31

> 2) Lantek agrees to an additional conditional payment to Peck of up to $1,000,000 provided that Lantek and/or Lantek II, or any company owned in whole or in part by Ester Mayorga, Domingo Mayorga, Lantek or Lantek II receive a contract for Phase 3 of the DFW Terminal B Project. Further terms are as follows:
>
> a) The scope of work defined in Phase 3A through 3C on the bid documents dated 6/30/2011 (attached) encompass the anticipated Phase 3 contract anticipated to be awarded by DFW in 2016 or 2017.
>
> b) 10% of the initial contract price (including all base contract(s) for the scope of work defined above, but excluding all change orders) awarded to Lantek and/or Lantek II, or any company owned in whole or in part by Ester Mayorga, Domingo Mayorga, Lantek or Lantek II, for work to be performed directly by such companies, for the DFW Terminal B Phase 3 contract shall to be paid to Peck - up to a maximum of $1,000,000.

(3 CR 1070, 4 CR 1679).

Through this section, the parties specifically intended to integrate Lantek's Phase 3 Subcontract as Section 2(b) states the "initial contract price" of the Phase 3 Subcontract was to be the basis of the 10% "additional conditional payment to Peck." (3 CR 1070, 4 CR 1679). Further, and importantly here, Section 2(b) states that the "initial contract price" was to be based on "***all base contract(s) for the scope of work defined above.***" (4 CR 1679) (emphasis added). Thus, determination of such contract price for the scope of work necessarily requires:

> (a) a comparison of the "scope of work" in "all base contract(s)" of the Phase 3 Subcontract with the "scope of work" defined in the Settlement Agreement at Section 2(a) of the Settlement Agreement, and
>
> (b) a determination of the contract price for that scope of work as provided by the Phase 3 Subcontract.

Consequently, the parties' fully integrated agreement to be interpreted by the Court includes both the Settlement Agreement ***and*** the Phase 3 Subcontract.

### a. The Phase 3 Subcontract language.

Turning to the Phase 3 Subcontract, the language in that subcontract defines the "scope of work" to be performed by Lantek as the work set out in Exhibit A to the Phase 3 Subcontract. (3 CR 1087, 1110-1126). The Phase 3 Subcontract also explains the payment for this Phase 3 work and noted that "[p]ricing is based on 100% IFC construction documents (drawings and specifications) dated April 9, 2014, and DCN #1, DCN #2, DCN #3."[3] (3 CR 1086, 1121-1125). Although Lantek would have this Court ignore certain portions of the Phase 3 Subcontract to determine the amount of the "initial contract price" for calculating the 10% payment to Peck, a review of the entire Phase 3 Subcontract provides that the initial contract price was the full GMP for the scope of the work identified in the Phase 3 Subcontract. (2 CR 329-331, 393-394, 3 CR 1086, 1121). As such, the "initial contract price" amount used to calculate Peck's 10% additional conditional payment under the Settlement Agreement integrated with the Phase 3 Subcontract is the GMP for the scope of work awarded.

The following three sections of the Phase 3 Subcontract confirm that the GMP amount for the scope of work of the Phase 3 Subcontract must be the "initial contract

---

[3] The term "100% IFC ("Issued for Construction") documents and DCN #1, DCN #2, DCN #3 ("Design Change Notices")" comprise the initial scope of work set out in in Exhibit "A" to the Phase 3 Subcontract and coincides with section 2(a) of the Settlement Agreement. (1 CR 393-394; 2 CR 503, 3 CR 1070, 1111-1126, 4 CR 1613).

price" set forth in the Settlement Agreement: (1) Section B Subcontract Amount (3 CR 1086), (2) Ex. A – Recap of Contract Amount (3 CR 1121), and (3) Ex. A – breakout of specific tasks and the costs associated therewith included in the scope of work. (3 CR 1122-1125).

First, Section B Subcontract Amount provides that Lantek is to receive $402,155 *plus additions and deductions agreed upon in writing*. (3 CR 1086). Relying solely on this section of the Phase 3 Subcontract, Lantek advocates for an interpretation that limits the initial contract price to $402,155 and ignores the language calling for "additions and deductions agreed upon in writing." *See* App.'s Br. at 18. Lantek's argument that this $402,155 figure is the initial contract price also ignores the provision that defines this figure as "partial funding" for a limited amount of the scope of work to be performed in the Phase 3 Subcontract and identifies it as an "Early Start Enabling" amount. (3 CR 1121).

Second, Exhibit A to the Phase 3 Subcontract entitled "Project Scope of Work Communications" identifies the entire scope of work for the Phase 3 Subcontract and provides for the full initial contract amount. (3 CR 1111-1126). In Section 4 of Exhibit A, the full initial contract amount is set forth under "Recap of Contract Amount." (3 CR 1121). There are three amounts listed in this section: (1) Early Start Enabling (Partial Funding) – $402,155; (2) Guaranteed Maximum Price ("GMP") of the Contract – $9,190,545 and (3) General Conditions GMP Phase 3 – $1,400,915.

34

The "Early Start Enabling" is defined as a "***portion*** of the values anticipated . . . for the communications scope of work" for the purpose of achieving "an early start for enabling activities in Phase 3." (3 CR 1121) (emphasis added). The activities included in this partial funding amount were "BIM work, Demolition and Make Safe." (3 CR 1121).

Finally, a review of breakout included in Exhibit A of the Phase 3 Subcontract shows the initial contract price is $9,190,545.47. (3 CR 1124-1125). This portion of the Phase 3 Subcontract shows the breakdown of all the work being performed for the original scope of work and cost associated therewith to reach the grand total GMP for Phase 3 of $9,190,545. (3 CR 1122-1125).

The Recap of Contract Amount section clearly shows the fallacy of Lantek's position. Lantek is erroneously relying only on an amount that is for a very limited part of the scope of the work of the Phase 3 Subcontract – not the scope of the work contemplated in the entire Phase 3 subcontract, which is the scope of work identified in the Settlement Agreement.

### b. The Settlement Agreement language.

Turning to the Settlement Agreement, the Settlement Agreement provided that Peck would receive "10% of the 'initial contract price (including *all* base contract(s) *for the scope of work defined above. . .*'") in Section 2(b). (3 CR 1070)

(emphasis added). The scope of work in the Settlement Agreement is defined as follows in Section 2(a):

> a) The scope of work defined in Phase 3A through 3C on the bid documents dated 6/30/2011 (attached) encompass the anticipated Phase 3 contract anticipated to be awarded by DFW in 2016 or 2017.

(3 CR 1070). The Phase 3 Subcontract confirms that the price for the scope of work is $9,190,545 when it links the price back to the scope of work by stating the following:

> Note: Pricing is based on 100% IFC construction documents (drawings and specifications) dated April 9, 2014 and DCN# 1,DCN#2 and DCN#3.

(1 CR 328-331, 393-396, 2 CR 499-501, 3 CR 1121). Thus, the unambiguous language of the Settlement Agreement demonstrates that the additional payment owed to Peck was not limited to the partial funding of $402,155, but comprises the amount set out in Phase 3 Subcontract for the entire scope of work – $9,190,545. (3 CR 1070, 1121). This interpretation was confirmed by the General Contractor for the Project, Keith Cooper the representative of Manhattan Construction Company and MBJ3, who testified that the scope of work defined in the Settlement Agreement at Section 2(a) matches the Project Scope of Work in the Phase 3 Subcontract. (1 CR 396).

Simply put, Lantek's position must be rejected because it ignores the totality of the language in Section 2 of the Settlement Agreement and ignores the integrated

language of the Phase 3 Subcontract that specifies that the Project Scope of Work awarded to Lantek contains the GMP of $9,190,545.

### 4. Headings do not control. The substance of the provision is controlling.

Additionally, Lantek attempts to limit the full initial contract price to the Early Start Enabling (partial funding) price by pointing to the fact that the funds beyond the $402,155 were paid out through a document titled "Change Order." *See* App.'s Br. At 17-22. In so arguing, Lantek would have this Court ignore the substance of Subcontract Change Order No. 001 (the document relied upon by Lantek to qualify as a "change order" pursuant to the Settlement Agreement), to avoid paying Peck his 10% on the remainder of the contract price associated with the original scope of the work performed. *See* App.'s Br. at 17-22. While a court may consider the title of a section contained in a contract when interpreting that contract, "greater weight must be given to the operative contractual clauses of the agreement." *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015). Thus, "titles and headings are not determinative, and when they are inconsistent with the plain meaning of the provision's operative language," the court gives greater weight to the operative language. *Id.*

For example, in *Enterprise Leasing v. Barrios*, the Texas Supreme Court construed a rental car agreement that contained a section with the heading of "Damage to Rented Car." *Enter. Leasing Co. v. Barrios*, 156 S.W.3d 547, 548-49

37

(Tex. 2004). That section read as follows:

> DAMAGE TO RENTED CAR: Renter is responsible for and agrees to pay to Owner the retail value of replacing and/or repairing all losses and damages to the rented car including "loss of use" during the period it is unavailable for rental use . . . regardless of fault or negligence of the Renter or any person, and regardless if damages are an act of God.

*Id.* The car was stolen while being rented. *Id.* Reversing the lower court, the court held that the contract unambiguously required the renter to reimburse Enterprise if the car was stolen, regardless of the section's heading in the contract, which only referred to "damages," because the content of which clearly related to all "loss of use" by Enterprise. *Id.*

Here, the trial court correctly construed the substance of the document rather than limiting its construction to the heading of the document. Although the document was titled "Subcontract Change Order," the contract document did not change the scope of work set out in the Phase 3 Subcontract as confirmed by the General Contractor for the DFW Terminal B Project, Manhattan/MBJ. (3 CR 1128-1129). Despite Lantek suggesting the "change order" was issued for additional work, the document did not change the amount of work to be performed. See App.'s Br. at 20; see also (3 CR 1081-1082, 1128-1129). The document merely set forth the payment for the GMP for the scope of work identified in Exhibit A of the Phase 3 Subcontract, less the Early Start Enabling Partial Funding amount of $402,155. (3 CR 1128-1129). Thus, the substance of the document shows it is not a "change

38

order," as that term is defined by the construction industry and as explained more fully in the following section.

### 5. Surrounding circumstances may be considered.

To correctly interpret the meaning of "change order," it is important to consider the industry meaning of the term and the surrounding circumstances when the parties entered into the Settlement Agreement. The Texas Supreme Court has stated that ambiguity need not exist to permit the trial court to look at extrinsic evidence of circumstances surrounding the formation and execution of the agreement. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981). If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. *Id.*

"The circumstances to be considered are not the parties' statements of what they intended the contract to mean, but circumstances known to the parties at the time they entered into the contract, such as what the industry considered to be the norm or reasonable and prudent." *KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex. App.—Houston [1st Dist.] 1987, writ denied); *see also Plains Expl. & Prod. Co. v. Torch Energy Advisors, Inc.*, 473 S.W.3d 296, 305 (Tex. 2005) (holding that "[c]onsideration of the surrounding facts and circumstances is simply an aid in the construction of [a] contract's language . . . ."); *Crossland Acquisition, Inc. v. HNTB Corp.*, 2016 Tex. App. LEXIS 8855, at *21 (Tex. App.—Houston [14th

Dist.], Aug. 16, 2016, pet. denied) (mem op.) (examining contracts in light of circumstances surrounding their execution); *see also Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) (holding "[w]e are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties . . . .").

Such surrounding circumstances include the requirement that courts construe commercial contracts in accordance with the customs and practices of the industry and locale(s) to which the contract relates. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(5). Evidence that might otherwise be excluded by operation of the parol evidence rule may be admissible to show industry custom or trade usage, which are presumed to be a "backdrop" against which all commercial contracts are drafted. *See Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1046 (5th Cir. 1971); *see also Royal Indem. Co. v. Marshall*, 378 S.W.2d 364, 370 (Tex. Civ. App.—Austin 1964) (approving the trial court's admission of expert testimony regarding the meaning of certain terms and industry practices among automobile dealers), *rev'd on other grounds*, 388 S.W.2d 176 (Tex. 1965).

As the Settlement Agreement references and integrates a construction contract and refers to a construction industry term (a "change order"), evidence to explain the meaning of technical terms is admissible. *See Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Trust,* 383 S.W.3d 581, 588 (Tex. App.—Houston [14th

Dist.] 2012, pet. denied); *see also Byrd v. Smyth*, 590 S.W.2d 772, 774–75 (Tex. Civ. App.—El Paso 1979, no writ); *Barrett v. Ferrell*, 550 S.W.2d 138, 141–42 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.) Because such evidence does not contradict or vary the written instrument, but rather, places the court in the position of the parties when they made the contract, it enables the court to appreciate the force of the words the parties used in reducing it to writing. *See Chase Manhattan*, 437 F. 2d at 1048. It is received where doubt arises upon the face of the instrument as to its meaning, not to enable the court to hear what the parties said, but to enable it to understand what they wrote, as they understood it at the time. *Id*. (citation omitted) Such evidence is explanatory, and must be consistent with the terms of the contract. *Id.* "Technical terms and words of art [should be] given their technical meaning when used in a transaction within their technical field." RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(b) (1981).[4]

---

[4] For example, in *Sivert v. Continental Oil Co.*, the court of civil appeals considered the admissibility of extrinsic evidence regarding the meaning of the terms "secondary recovery" and "waterflood," which the parties used in a written unitization agreement. *See* 497 S.W.2d 482, 489 (Tex. Civ. App.—San Antonio 1973, writ ref'd n.r.e.). Noting that "Texas courts have consistently permitted this type of testimony," the court of civil appeals found that the trial court did not err in permitting two petroleum engineers to testify as to the meaning of the terms. *Id*. The court explained that, because the terms "secondary recovery" and "waterflood" were technical terms peculiarly applicable to the oil industry, the extrinsic evidence was not parol evidence tending to vary the terms of the written agreement, but was explanatory of such technical terms used in the unitization agreement. *Id.*

A "usage of trade" can refer either to a habitual or customary practice in a particular trade or location, or to a meaning ascribed to a word or phrase that is commonly understood by those in a particular trade or location. *See* RESTATEMENT (SECOND) OF CONTRACTS § 219 cmt. a. Evidence that might otherwise be excluded by operation of the parol evidence rule may be admissible to show the scope of the work or transaction contemplated by the contract. *See Moreau v. Otis Elevator Co.*, 531 F.2d 311, 313 (5th Cir. 1976). A "change order" is the customary method for changing the scope of work or the terms of an agreement in the construction industry. For example, in *City of Fort Worth v. Gene Hill Equipment Co.*, this Court construed the City's agreement with one of its contractors to determine if the contractor was required to submit a "change order" when the he discovered abnormal excavation conditions. *City of Fort Worth v. Gene Hill Equipment Co.*, 761 S.W.2d 816, 817 (Tex. App.—Fort Worth 1988, no writ). This Court referred to the "change order" as an instrument to authorize "compensation for additional work." *Id.* at 820.[5]

Here, there are three important circumstances surrounding the Settlement Agreement that are pertinent. First is the fact that the work on the DFW Terminal B Project was divided into and contracted out in three phases. While Peck procured the

---

[5] *See also, e.g.,* TEX. LOCAL GOV'T CODE §281.046(e) (entitled "Contracts" and providing, inter alia, that "after a contract is awarded, an authority decides that additional work is needed or that the character or type of work or facilities should be changed, the board may authorize change orders to the contract. . . .").

rights to all three phases for Lantek, he resigned during the first Phase and was not an employee of Lantek for either Phase 2 or Phase 3. (2 CR 496, 4 CR 1681-1683). The Phase 1 Subcontract did not include an early start enabling partial funding component and only included a guaranteed maximum price for the scope of work provided. (2 CR 505-506, 594-631). On June 5, 2014, a little over a year after Peck resigned (and approximately one year before the Settlement Agreement), Lantek obtained the Phase 2 Subcontract. The Phase 2 Subcontract included an early start enabling partial funding component and a document called a change order to authorize the remaining portion of the GMP for the entirety of the original scope of work for Phase 2. (2 CR 509, 517-574).

Armed with this knowledge of the partial funding aspect of the Phase 2 Subcontract, Lantek attempted to deceive Peck into accepting the conditional additional payment based on the "early start enabling, partial funding" rather than the entire GMP for the scope of work by excluding change orders from the definition of Phase 3. But Lantek's scheme failed because of the industry meaning of the term "change order" and the language of both the four corners of the Settlement Agreement and integration of the Phase 3 Subcontract. Such full understanding of the circumstances and entire integrated contract language prevent reading the document titled "Subcontract Change Order" No. 001 from being interpreted as an exclusion to the initial contract price, both because of the terms of the Phase 3 Subcontract set out

43

*supra* as well as the fact that such "change order" does not contain any change in the scope of work, but rather acts as the mechanism to release the remaining GMP for the scope of work in the Phase 3 Subcontract.

To emphasize such surrounding circumstances, and to place the Court in the position of the parties when they agreed to the Settlement Agreement and enable the Court to appreciate the force of the words the Parties used in the Settlement Agreement, the definition of change order must be examined. While Lantek relies solely on the title of Subcontract Change Order No. 001, and not the substance, Keith Cooper (a Vice President of Manhattan Construction Company with decades of experience managing multi-million and even billion dollar projects, including the last eight years managing the DFW Terminal Project for MBJ3) testified that such document is in fact, not a change order, which is consistent with the authority cited *supra*.

Mr. Cooper testifies that the following two definitions accurately define a change order when used in the context of a construction agreement:

Dictionary of Construction

## change order

Definition

Written authorization provided to a contractor approving a change from the original plans, specifications, or other contract documents, as well as a change in the cost. With the proper signatures, a change order is considered a legal document.

## Change order

From Wikipedia, the free encyclopedia

In project management, a **change order** is a component of the change management process whereby changes in the Scope of Work agreed to by the Owner, Contractor and Architect/Engineer are implemented.

A change order is work that is added to or deleted from the original scope of work of a contract, however, depending on the magnitude of the Change, it may or may not alter the original contract amount and/or completion date. A change order may fork a new project to handle significant changes to the current project.[1]

Change orders are common to most projects, and very common with large projects. After the original scope (or contract) is formed, complete with the total price to be paid and the specific work to be completed, a client may decide that the original plans do not best represent his or her definition for the finished project. Accordingly, the client will suggest an alternate approach.

Common causes for change orders to be created are:

- The project's work was incorrectly estimated
- The customer or project team discovers obstacles or possible efficiencies that require them to deviate from the original plan
- The customer or project team are inefficient or incapable of completing their required deliverables within budget, and additional money, time, or resources must be added to the project
- During the course of the project, additional features or options are perceived and requested.
- If the contractor has to add work items to the original scope of work at a later time in order to achieve the customer's demands, a fair price for the work items and fees must be added for the materials and labor.
- Extreme weather conditions cause delays (http://www.snapfieldreport.com/weather-delays-can-you-get-paid/) or require additional work to complete construction.

A project manager then typically generates a change order that describes the new work to be done (or not done in some cases), and the price to be paid for this new work. Once this change order is submitted and approved it generally serves to alter the original contract such that the change order now becomes part of the contract.

(1 CR 389). Mr. Cooper also testified that in the context of the DFW Terminal B Project, a change order would have to involve an activity or scope outside the scope determined by the IFC (issued for construction) and DCN (design change notices) used to bid and award the contract. (1 CR 389-390).

Mr. Cooper testified regarding Subcontract Change Order No. 001 (the document relied on by Lantek to qualify as a "change order" pursuant to the Settlement Agreement), that such document does not change the scope of work set out in the Phase 3 Subcontract and does not change the IFC, but rather just releases the remainder of the GMP (contract price) for the original scope of work. (1 CR

395, 420-421, 467).[6] To be completely clear that Subcontract Change Order No. 001 was not a change order and only titled as one, Cooper agreed:

```
          Q.   (BY MR. BOWDICH)  With respect to the
definition that we've established for change order, this
Change Order No. 1 for Phase 3, it -- it is a change
order in name only.  And by that, I mean using our
definition of change order, there is absolutely no
change in the original scope of work.  The only change
is that now instead of releasing just the seed money,
now the entire guaranteed maximum price has been
released?
                    MR. ZIMMERMANN:  Objection.
     A.   That's correct.
```

(1 CR 408).

The final circumstance to put the Court in the same position as the parties in construing the Settlement Agreement revolves around Lantek's request to "clarify" the definition of Phase 3 in the Settlement Agreement after all material terms were agreed. Specifically, following mediation at which the amount of the settlement was determined, but the method of payment and additional terms were not, Lantek (including its owners Ester and Domingo Mayorga) approved a series of settlement offers communicated to Peck via email between attorneys for the parties. (2 CR

---

[6] By contrast, Mr. Cooper continued to testify that a change order would deviate from the original scope of work, include a PCCO (project change) and include a CE (cost event) all of which is included in Subcontract Change Order No. 002 which is attached to his Affidavit as Exhibit "A-3" and Deposition at Exhibit 4 at "A-3." (1 CR 395).

634-644). In all of these email offers, Ester Mayorga admitted the amount of the additional conditional payment to Peck in Section 2 of the Settlement Agreement (10% of the initial contract price) never changed. (2 CR 634-638, 649-711). Nothing in the surrounding circumstances indicated that any changes to Section 2 of the Settlement Agreement were made to alter how much Peck was to be paid – 10% of the initial contract price for the original scope of work for Phase 3.

**6.  Peck's interpretation does not treat the exclusion of change order language as mere surplusage.**

Lantek's argument that Peck treats the phrase "excluding all change orders" as mere surplusage is simply wrong. *See* App.'s Br. at 19-22. First, as shown above, the document titled "Subcontract Change Order No. 001," upon which Lantek relies to justify limiting Peck's payment is not a "change order" as that term is defined by industry standards. *See supra* sections B(4) and B(5).

Second, even if this Court were to construe Subcontract Change Order No. 001 as a "change order" that is excluded from the Settlement Agreement, the Settlement Agreement's "initial contract price" language necessitates that Peck is to be paid 10% of the full initial contract price for the original scope of work as set forth in the Phase 3 Subcontract – which is $9,190,545. (3 CR 1070-1071, 1121). There is no need to even look at the change order to determine the initial contract price. The initial contract price is found in the Phase 3 Subcontract.

Furthermore, Lantek's reliance on the timing of the payments to Peck to determine the amount Peck was entitled to receive does not support Lantek's position that the parties agreed to the partial funding amount of $402,155 as the base price by which the 10% payment would be calculated. *See* App.'s Br. a 20-21. Lantek was obligated to pay 10% on the full initial contract price for the scope of work contemplated in the Phase 3 Subcontract – nothing more and nothing less. (3 CR 1070). Should Lantek not complete all the work awarded to it for the $9.1 million GMP, that does not lessen the amount Peck was to receive. (3 CR 1070-1071). Additionally, the Settlement Agreement called for Lantek to pay the 10% amount in eight equal quarterly payments, with the first payment due 30 days following payment of Lantek's first pay application, followed by seven consecutive quarterly payments thereafter. (3 CR 1070). Those quarterly payments were based on the $9.1 million GMP, less the amount of work to be performed by Lantek's subcontractors (Vanguard Electrical, Siemens, and Ford AV), leaving the portion directly performed by Lantek as $5,565,946.90. (3 CR 1123-1126). Pursuant to the Settlement Agreement, Lantek was required to pay Peck 10% of that amount, or $556,594.69. (3 CR 1070).

Thus, Peck's interpretation does not treat the "excluding all change orders" language as mere surplusage, as Lantek suggests. Rather, Peck's interpretation is the only reasonable interpretation considering all the language in the parties'

agreement. As shown more fully above, under no circumstances is Lantek's interpretation of the agreement reasonable to allow this Court to reverse and render and at best, if there is an ambiguity in the agreement, this Court can only reverse and remand to the trial court.[7] *See e.g., Coker v. Coker,* 650 S.W.2d 391, 394-395 (Tex. 1983) (reversing trial court's summary judgment upon a finding of ambiguity in the terms of the parties' agreement).

In sum, based on consideration of (a) the four corners of the Settlement Agreement establishing that Peck was to be paid 10% of the contract price for the original scope of work, (b) the integrated Phase 3 Subcontract language on the Project Scope of Work and Guaranteed Maximum Price for such scope of work, (c) the industry custom for the meaning of a change order, and (d) the surrounding circumstances of the settlement, all provide for the reasonable interpretation that Peck should be paid, not on the "early start enabling (partial funding)" amount of $402,155, but instead on the portion of the $9.1 million performed by Lantek for the Project Scope of Work.

Pursuant to the Scope of Work for the Phase 3 Subcontract, the full contract price for the original scope of work (the GMP for 100% of IFC plus DCN Nos. 1-3)

---

[7] Lantek asserts an alternative argument that the Settlement Agreement is ambiguous warranting reversal. *See* App.'s Br. at 22-26. For the reasons set forth in Section B of this Appellee's Brief, Peck has shown that the Settlement Agreement is not ambiguous and Peck's interpretation is the only reasonable and correct interpretation.

is $9,190,545. (3 CR 1125). Of the full contract price for the original scope of work, Lantek's subcontractors (Vanguard Electrical, Siemens, and Ford AV) performed $3,564,891.54 for 100% of IFC, as well as $43,602.50 for DCN #1 and $16,104.06 for DCN #3, leaving the portion directly performed by Lantek as $5,565,946.90. (3 CR 1123-1126). Pursuant to the Settlement Agreement, Lantek was required to pay Peck 10% of that amount, or $556,594.69. Thus, the trial court correctly interpreted the agreements to conclude that Lantek's payment of 10% of the "early start enabling (partial funding)" amount of $402,155 breached the Settlement Agreement.

## C. The trial court correctly awarded Peck his attorney's fees under Chapter 38.

Citing to the parties' Release and Settlement Agreement, Lantek's sole argument in opposition of the trial court's award of attorney's fees is to wrongly suggest that Peck released his claim for attorney's fees in the Amended Mutual Release Agreement that accompanied the parties' Rule 11 Settlement Agreement. *See* App.'s Br. at 26-28. Although the parties entered into a release in contemplation of settling the previous claims, under no circumstances did the parties release their Chapter 38 right to attorney's fees for breach of the Settlement Agreement. (3 CR 1206-08).

More specifically, the Release is limited to the claims in the underlying lawsuit – not a claim for breach of the Settlement Agreement:

50

> 2. RELEASE BY PECK. With the exception of the duties and obligations stated herein, and for the consideration provided by the Rule 11 Agreement, Peck and anyone claiming by, through or under Peck hereby irrevocably and unconditionally releases, acquits, and forever discharges Lantek and Mayorga of and from any and all Claims and Damages of any kind whatsoever against Lantek or Mayorga related to or arising from Lantek, the Litigation, and the subject matter of the Litigation. Peck acknowledges and agrees that the Release set forth herein is a broad, general and unconditional release that should be liberally construed in favor of Lantek and Mayorga, and by virtue of same Peck does and intends to give up any and all Claims or Damages Peck may have against Lantek or Mayorga, related to or arising from Lantek, the Litigation, and the subject matter of the Litigation.

(3 CR 1202). The release does not include a release of the party's claim for breach of the Settlement Agreement.

In an action for breach of contract, Texas law allows for the recovery of reasonable attorney's fees under Section 38.001 of the Texas Civil Practices & Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE §38.001. Peck sued for breach of the Settlement Agreement and sought his attorney's fees under Chapter 38. (3 CR 1055-1067). The Release did not limit Peck's right to recover such fees.

Moreover, Lantek and Peck entered into a stipulation regarding the attorney's fees. (4 CR 1829-1831). That stipulation provided as follows as to attorney's fees:

> 2. Without waiving any appeal as to liability, assuming the Order is not overturned after any appeals and Lantek's breach of contract is included in the final judgment, Lantek stipulates that Peck is entitled to reasonable and necessary attorneys' fees from Lantek in the following amounts, which are already segregated to exclude fees relating solely to a claim for which such fees are unrecoverable:

(4 CR 1829). Certainly, if the trial court's award of summary judgment on the breach of Settlement Agreement is reversed, then the Stipulation provides for an exception to the award of attorney's fees in the statement "[w]ithout waiving any appeal as to

51

liability." *Id.* But the Stipulation expressly provides that "assuming the Order is not overturned after any appeals and Lantek's breach of contract is included in the final judgment, Lantek **stipulates** that Peck is entitled to reasonable and necessary attorneys' fees from Lantek." *Id.* (emphasis added). As such, Lantek has waived its argument that Peck is somehow not entitled to his attorney's fees for successfully prosecuting his breach of the Settlement Agreement claim. For Lantek to now argue that the parties' Release in connection with the Settlement Agreement somehow captures attorney's fees to prosecute a breach of the Settlement Agreement is completely absurd and wholly contrary to the very stipulation Lantek signed. Thus, the trial court did not err in granting Peck his attorney's fees for successfully prosecuting the breach of Settlement Agreement claim.

In sum, the trial court correctly interpreted the Settlement Agreement in favor of Peck based on well-settled principles of contract construction and correctly awarded Peck his attorney's fees for successfully prosecuting his breach of the Settlement Agreement.[8] Thus, this Court should affirm the trial court's award of

---

[8] Peck also moved for a no-evidence motion for summary judgment on Lantek's affirmative defenses of accord and satisfaction, arbitration and award, payment and release. (3 CR 1025, 1051-1054). Except for the affirmative defense of release, which Peck has addressed in the Argument section C of his Appellee's Brief, Lantek does not challenge the trial court's award of summary judgment on his other affirmative defenses. *See* App.'s Br. As such, Lantek has waived any challenge to the no-evidence summary judgment on his affirmative defenses of accord and satisfaction, arbitration and award and payment. *See* TEX. R. APP. P. 38.1(i); *see also LeBlanc v. Riley,* No. 2-08-234-CV, 2009 Tex. App. LEXIS 2204, *12-13 (Tex. App.—Fort Worth April 2, 2009, no pet.).

summary judgment in favor of Peck on his breach of contract and attorney's fees claims. This Court should affirm the trial court's denial of Lantek's motion for summary judgment on its declaratory judgment action. Alternatively, should the Court find that the Settlement Agreement is ambiguous, this Court should reverse and remand – not reverse and render, as Lantek's interpretation is wholly unreasonable as shown in detail above.

## CROSS-APPELLANT'S ARGUMENT

**A. The trial court erred in granting the Lantek Parties summary judgment on Peck's fraud claims[9].**

On the same day the trial court granted summary judgment in favor of Peck on his counterclaim for breach of settlement agreement, the trial court also granted summary judgment in favor of the Lantek Parties on Peck's counterclaims for fraud and fraud in the inducement[10]. (4 CR 1828). Alternatively, Peck pled claims for fraud and fraud in the inducement. (3 CR 1064-1065, 3 CR 1344-1346, 4 CR 1751-1753). To the extent this Court could reverse the trial court's summary judgment on the breach of contract claim, which Peck does not concede that such result should occur, Peck has filed his notice of cross-appeal on the trial court's summary

---

[9] Peck adopts and incorporates the same Statement of Facts and Summary of Argument sections in his Appellee's Brief as part of his Cross-Appellant's Brief.

[10] The Lantek Parties did not move for no-evidence summary judgment on Peck's counterclaim for fraud by nondisclosure. *See section __, infra.* To the extent this court could find otherwise, Peck has addressed the merits of this claim as well. *Id.*

53

judgment on his fraud counterclaims so that this Court may reverse the summary judgment on such fraud counterclaims, as well. (4 CR 1843-1845).

Peck's counterclaims are based on communications related to certain language the Lantek Parties requested be added to the section concerning the conditional additional payment in the Settlement Agreement. (3 CR 1344-1345). This language was requested under the guise of seeking to "clarify" the Settlement Agreement. (2 CR 639). Through this lawsuit, the Lantek Parties have sought to use their clarification language to defraud Peck in an amount in excess of $500,000.00. (2 CR 639). The Lantek Parties failed to disclose material facts known only to them about the Phase 3 Subcontract upon which the settlement payment is based. (2 CR 639, 641). The Lantek Parties knew of the unusual payment structure involved; yet, it failed to disclose the details of such payment structure and instead, used that information to create a substantially false impression to Peck through the addition of the "initial" and "change order" terms. (2 CR 639, 641; 4 CR 1439-40; 4 CR 1680-81).

The Lantek Parties filed a no-evidence motion for summary judgment on Peck's fraud counterclaims for fraud and fraud in the inducement.[11] (2 CR 724-

---

[11] The Lantek Parties also asserted a traditional motion for summary judgment on what it called a claim for "fraudulent representation" arguing that no such claim exists. (2 CR 735). This is the only argument the Lantek Parties assert to support its attempt at a traditional motion for summary judgment. (2 CR 724-736).

1018).  Peck filed a response, including sufficient summary judgment evidence to raise a genuine issue of material fact on each of the challenged elements of Peck's fraud counterclaims.  (4 CR 1424-1741).  The Lantek Parties filed no reply. Despite producing sufficient summary judgment evidence to raise a genuine issue of material fact on each of Peck's fraud counterclaims, the trial court granted the Lantek Parties' summary judgment on such counterclaims.  (4 CR 1828).  But as shown in more detail below, the trial court erred in granting summary judgment on the counterclaims for fraud and fraud in the inducement.

### 1. Standard of Review.

Peck adopts and incorporates the Standard of Review section on pages 26-28 of his Appellee's Brief.

### 2. Peck's counterclaims for Fraud and Fraud in the Inducement.

The trial court erred by granting the Lantek Parties' no-evidence motion for summary judgment on Peck's claims for fraud and fraud in the inducement because Peck presented sufficient summary judgment evidence to raise a genuine issue of material fact on each element of those causes of action.

The elements of fraud and fraud in the inducement are:

> (1) that a material misrepresentation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party justifiably relied upon it; [and] (6) that he thereby suffered injury.

*See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011) (finding sufficient evidence of reliance and reversing trial court on directed verdict on fraud claim); *see also Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983) (finding sufficient evidence of reliance and upholding jury verdict). "Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraud in the inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Hasse v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001).

### a. The Lantek Parties made a material misrepresentation to Peck.

"A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question." *Miller v. Kennedy & Minshew, Prof'l Corp.,* 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied) (upholding fraud claim against clients who made material misrepresentations to attorney regarding sale of stock to induce attorney into contingency fee agreement). "Materiality thus centers on whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question. *Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 Tex. App. LEXIS 3624, at *17-18 (Tex. App.—Fort Worth, May 12, 2011, pet.

denied) (*citing Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied) (finding that seller of store made misrepresentations to buyer of store regarding store items to be included in the purchase and the store's revenue). "Even if a misrepresentation is not a party's sole inducement for entering into [a] contract, it may still be material so long as the party relied on it." *Reservoir Sys. v. TGS-NOPEC Geophysical Co., L.P.,* 335 S.W.3d 297, 305 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Here, as shown in Peck's summary judgment evidence, the Lantek Parties knew of the unusual payment structure involved and used that information to create a material and substantially false impression to Peck through the addition of the terms "initial" and "excluding change order." (2 CR 635, 4 CR 1439-40). The Lantek Parties requested, not to change, but to "clarify" the definitions of the Phase 3 scope of work in the Settlement Agreement by excluding change orders. (2 CR 638, 4 CR 1680-1681, 1699-1700). The Lantek Parties explained the basis for the requested clarification to exclude change orders as preventing Peck from being compensated for additional work beyond the original scope when he did not procure such work nor was an owner of Lantek at the time the work was procured. (4 CR 1680-1681).

**b.    The misrepresentation was false.**

Through the Affidavit of Keith Cooper, Vice-President of Manhattan Construction, Peck presented competent summary judgment evidence that the Lantek Parties knew that the Phase 3 Subcontract would include an initial payment for only a portion of the original scope of work known as the "Early Start Enabling (Partial Funding)" and that the release of the remainder of the money for the original scope of work would occur pursuant to a change order.  (4 CR 1439-40). Cooper further explained that the Phase 3 Subcontract would be similar to the Phase 2 Subcontract, with a Guaranteed Maximum Price (here, $9,190,545), preceded by an initial contract amount (here, partial funding of $402,155).   (4 CR 1439-40). Importantly, Cooper testified Lantek knew that the remainder of the Guaranteed Maximum Price would be paid through a document titled "Subcontract Change Order."  (4 CR 1439-40). Thus, any representations by the Lantek Parties that the terms "initial" and "excluding change order" were meant to clarify the scope of work from the Phase 3 Subcontract or ensure that Peck was not paid on work in excess of the original scope of work were patently false.  (4 CR 1680-1681, 1699-1700).  Peck has presented sufficient evidence to raise a genuine issue of material fact as to whether the Lantek Parties' representations about the Phase 3 Subcontract award were false.

58

### c. When the Lantek Parties made the representation, they knew the representation was false or made the representation recklessly without any knowledge of the truth and as a positive assertion.

Lantek knew that it would receive the "Early Start Enabling (Partial Funding)" and that the remainder of the money for the original scope of work for the Phase 3 Subcontract would occur in a change order.[12] (4 CR 1439-40). After Peck resigned from Lantek, Lantek entered into the Phase 2 Subcontract for the Terminal B Project on June 5, 2014. (4 CR 1681). When the Settlement Agreement was negotiated between February 12, 2015 and May 7, 2015 Lantek had already completed Phase 1 and was in the process of completing Phase 2. (4 CR 1682-1683). Based on the documents produced by Lantek, Lantek had already submitted its bid amount for the original (also known as base) scope of work for Phase 3 prior to May 7, 2015. (4 CR 1440, 1602-1676, 1682). When the Lantek Parties stated that the "excluding change orders" language was needed to prevent Peck from receiving 10% for any

---

[12] The Lantek Parties argued in their no-evidence motion for summary judgment on Peck's fraud claims that "[e]ven if evidence were available to indicate what he alleges was said, it would be inadmissible as if it occurred, it did so during settlement negotiations and is inadmissible under Tex. Rules Evidence 408(a)(2) and Tex. Civ. Prac. & Rem. Code 154.073." (2 CR 728). The Lantek Parties' arguments fail. Rule 408 provides that certain settlement evidence, as set forth in the rule, is not admissible to "prove or disprove the validity or amount of a disputed claim." However, such settlement information is admissible "for other purposes." Peck would be offering the evidence, not to prove or disprove the amount of the disputed Rule 11 Agreement at that time, but as evidence of fraud. Additionally, Section 154.073 of the Texas Civil Practice and Remedies Code is inapplicable here, as the statements did not occur during mediation or any other settlement process using a neutral third-party.

work beyond the original scope and for which he did not procure, the Lantek Parties

already knew the following:

- Phase 2 Subcontract did not have the same payment structure as the Phase 1 Contract; and

- Phase 3 Subcontract would have a similar payment structure as Phase 2, and include an initial price for Early Start Enabling (a portion of the original scope of work), followed by payment of the remainder of the GMP for the original scope of work by a document titled a change order.

(4 CR 1438-1440).

### d. The Lantek Parties intended Peck to act upon its misrepresentations.

The element of intent is proven when a defendant makes representations with

the "intent to deceive and with no intention of performing as represented." *Formosa*

*Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 48 (Tex. 1998)

(upholding fraud finding). While the failure to perform, standing alone, is not

necessarily evidence of a promisor's intent not to perform when the promise is made,

that fact is a circumstance to be considered when other facts establish intent.

*Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (holding that

summary judgment on fraud claim that company's president created incentive

program to induce two vice-presidents to stay and never intended to implement the

incentive program). As "intent to defraud is not susceptible to direct proof, it

invariably must be proven by circumstantial evidence." *Id.* "Slight circumstantial

evidence" of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent. *Id.* (citations omitted).

Here, Ester Mayorga admitted in her deposition that in all of the versions of the Settlement Agreement – from March 2, 2015 to May 7, 2015 – until the last two versions, the amount to be paid to Peck remained the same – 10% of the initial contract price. (2 CR 634-638, 649-711). For the last two iterations, which were supposed to only "clarify" the definition of Phase 3 according to the emails between each parties' attorneys and not change the amount paid, Lantek's attorneys refused to allow Ms. Mayorga to answer questions about Lantek's intent or understanding of those two versions of the Settlement Agreement. (2 CR 638, 642-644). Lantek then refused to comply with the Settlement Agreement and to pay Peck 10% of the award for the initial scope of work which was already known to Lantek during the negotiations. Based on the Lantek Parties' knowledge of the Phase 3 Subcontract with an initial contract price for only the early start enabling and subsequent release of the remainder of the award by a change order in heading, and subsequent breach, paying 10% on the partial funding for the early start enabling, Peck has presented competent summary judgment evidence to raise a genuine issue of material fact as to whether the Lantek Parties intended for Peck to rely on its misrepresentations. (4 CR 1684).

### e. Peck justifiably relied on the Lantek Parties' misrepresentations.

To prevail on a fraud claim, a party must show "actual and justifiable reliance on the misrepresentation." *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Although generally courts have acknowledged that a third party's reliance on an opposing attorney's representation is not justified when the representation takes place in an adversarial context, such general propositions does not preclude justifiable reliance in all cases. *See McCamish v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999). The issue of justifiable reliance is a question for the factfinder. *See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). "In determining whether . . . the justifiable reliance element is met, [courts] consider the nature of the relationship and the contract." *Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 840, 843, no pet.).

For example, in *Miller v. Kennedy & Minshew, P.C.,* 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied), this Court found justifiable reliance by an attorney on representations that his client made to induce the attorney to agree to a contingency fee arrangement, as opposed to an hourly fee arrangement. Specifically, this Court reasoned, "the evidence shows that [the client] induced [the attorney] to enter into the . . . contingent fee provision . . . by withholding from [the

62

attorney] the fact that [the client] had no intention of doing the very thing that would give rise to his contractual duty to perform under the [contingency fee] provision . . . . The evidence also shows that [the attorney] reasonably relied on [the client's] failure to disclose . . . ." *Id.* at 345.

Additionally, in *Hannon, Inc. v. Scott*, this Court held that the purchaser of a store did not have to conduct an independent investigation or audit of the seller to justifiably rely on the seller's false and material representations. *Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 Tex. App. LEXIS 3624, at *23-24 (Tex. App.—Fort Worth May 12, 2011, pet denied) (mem op.). This Court reasoned, "[t]his is because, in light of the record, [seller's] misrepresentations about [certain items seller said would be included in the sale of seller's business and about the business's daily revenue] were not outlandish, preposterous, or so patently and obviously false that [the buyer] had to have closed his eyes to avoid discovering their falseness, nor were there any attendant 'red flags' indicating that [the buyer's] actual reliance was unjustified." *Id.*

Here, the falsity of the Lantek Parties' misrepresentations was not "obvious" to Peck.[13] (4 CR 1681-1686) Had the Lantek Parties not withheld from Peck their

---

[13] While Peck has not asserted a claim against the Lantek Parties' counsel, Peck does assert that, as Lantek's agents, Lantek's counsel assisted Lantek in committing fraud against Peck. An attorney is not automatically immune from suit from a non-client. *See Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 483 (Tex. 2015) (holding that "an attorney's participation in 'independently fraudulent activities' is considered 'foreign to the duties of an attorney' and is not shielded from liability") (citations omitted); *see also* TEX. DISC. R. OF PROF. CONDUCT 4.01 (precluding a lawyer

knowledge regarding the payment structure of the Phase 3 Subcontract, including the initial payment for the Early Start Enabling (Partial Funding) and the remainder of the GMP paid by change order, in contrast to the Phase 1 Subcontract, then Peck would not have agreed to add the Lantek Parties' proposed addition of "initial" or "excluding change orders" to the Settlement Agreement. (4 CR 1678-87). As the Lantek Parties used that language in the trial court to contradict the remaining language in Section 2 of the Settlement Agreement and avoid paying Peck in excess of $500,000, Peck relied on the Lantek Parties' fraudulent representation to his detriment. (4 CR 1678-87).

As the impression given by the Lantek Parties' representations did not contradict the express unambiguous terms of the Settlement Agreement, Peck's reliance was justified. The 10% additional payment to Peck provided in Section 2 of the Settlement Agreement was based on the "initial" "contract price" of the Phase 3 Contract based on "all base contract(s) for the scope of work defined above." (4 CR 1437-1441). Therefore, when the Lantek Parties added "initial," Peck believed that to mean the price for the original scope of work based on the Phase 1 Subcontract, which would not contradict the language of the Settlement Agreement. (4 CR 1678-87).

---

from making a false statement of material fact or law to a third person and precluding a lawyer from failing to disclose a material fact to a third person when disclosure is necessary to avoid knowingly assisting a fraudulent act perpetrated by the client).

Likewise, when the Lantek Parties requested that change orders be excluded for the purpose of not paying Peck for work procured by Lantek after Peck left the company, *i.e.*, additions to the scope of work, the impression given by their representation – that any change orders would be to enlarge the scope of work, not that the payment of the remaining GMP for the original scope of work – did not contradict the language in the Settlement Agreement. (4 CR 1678-87). The false impressions given by the Lantek Parties' representations were consistent with the Settlement Agreement. (4 CR 1678-87). Thus, Peck's reliance on such representations in agreeing to Lantek's requested additions of "initial" and "but excluding change orders" was justified.

### f. Peck was injured as a result of the Lantek Parties' misrepresentations.

As shown above, Peck suffered injury in excess of $500,000 due to the Lantek Parties' misrepresentations. (4 CR 1439). Peck has raised a genuine issue of material fact to support this element of his fraud and fraud in the inducement claims against the Lantek Parties. Specifically, Peck presented as summary judgment the Affidavit of Keith Cooper, also discussed above. Mr. Cooper testified that Lantek knew that the initial contract amount of $402,155 was only a portion of the payment to be made on the Phase 3 Subcontract. (4 CR 1439). Mr. Cooper testified that a subsequent payment, in the form of a Guaranteed Maximum Price, of $9,190,545, would be authorized via a document titled "Subcontract Change Order." (4 CR

65

1439-40). Peck was injured because he received a payment for only 10% of the $402,155, instead of 10% of the Guaranteed Maximum Price of $9,190,545, less the amounts paid to Lantek's subcontractors.[14] (4 CR 1682-1686). If the Lantek Parties had not misrepresented information about the clarifying language and that the initial contract price would be authorized in a change order, Peck would not have suffered injury. Peck has presented sufficient summary judgment evidence to raise a genuine issue of material fact that he suffered injury as a result of the Lantek Parties' misrepresentations.

### 3. Peck's counterclaims for Fraud by Nondisclosure.

On May 4, 2017, Peck filed his third amended counterclaim pleading an additional fraud claim – namely, his fraud by nondisclosure claim. (3 CR 1335-1417). While the Lantek Parties filed a no-evidence motion for summary judgment on Peck's fraud and fraudulent inducement claims, the Lantek Parties never moved for summary judgment on Peck's claim for fraud by nondisclosure. (2 CR 724-736). An appellate court cannot affirm a no-evidence motion for summary judgment on a claim that was not challenged in the no-evidence motion for summary judgment. *See* TEX. R. CIV. P. 166a(i) (providing that a no-evidence motion for summary judgment must state "the elements as to which there is no evidence"); *see also*

---

[14] Of that full contract price for the original scope of work, Lantek's subcontractors (Vanguard Electrical, Siemens, and Ford AV) performed $3,564,891.54 for 100% of IFC, as well as $43,602.50 for DCN #1 and $16,104.06 for DCN #3, leaving Lantek's portion as $5,565,946.90. (3 CR 1123-1126).

*Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) (holding that nonmovant has the burden to produce summary judgment evidence on *challenged* elements) (emphasis added). Thus, the trial court erred when it granted the Lantek Parties' summary judgment on Peck's fraud by nondisclosure counterclaim because the trial court granted more relief than the Lantek Parties requested. *See id.*

To the extent that this Court could hold that the Lantek Parties' no-evidence motion for summary judgment sufficiently challenged the fraud by non-disclosure claim, summary judgment as to this claim was not proper because Peck presented sufficient summary judgment evidence to raise a genuine issue of material fact as to each element of his fraud by non-disclosure claim.

The elements of fraud by nondisclosure require (1) a deliberate failure to disclose material facts, (2) by one who had a duty to disclose such facts, (3) to another who was ignorant of the facts and did not have an equal opportunity to discover them, (4) with the intent the listener act or refrain from acting, and (5) the listener relies on the nondisclosure resulting in injury. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). "Slight circumstantial evidence" of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

### a. The Lantek Parties deliberately failed to disclose material facts to Peck.

As shown above, the circumstances surrounding the Lantek Parties' fraud by non-disclosure, including (1) adding the term "initial" to the term "contract price," based on the knowledge of the payment structure of the Phase 3 Subcontract having an initial contract price that did not include the full amount for the original scope of work (4 CR 1439, 1684); and (2) after the original scope for Phase 3 was added to the Settlement Agreement, the Lantek Parties' request to "clarify" that scope by adding "excluding change orders" based on the knowledge and concealment that the Phase 3 Subcontract would have the remainder of the GMP for the original scope of work paid pursuant to a change order. (4 CR 1439-40, 1678-87). Thus, Peck raised a genuine issue of material fact as to this element of his fraud by nondisclosure claim.

### b. The Lantek Parties had a duty to disclose material facts to Peck.

A duty to disclose may arise in a commercial context in four situations: (a) when there is a fiduciary relationship between the parties; (b) when one voluntarily discloses information, the whole truth must be disclosed; (c) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; or (d) when one makes a partial disclosure and conveys a false impression. *Citizens Nat'l Bank v. Allen Rae Invs.,*

*Inc.*, 142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.) (upholding fraud by nondisclosure claim). A fraudulent non-disclosure can arise when one party does not have equal access to information. *See id.*

As shown above, Peck produced sufficient summary judgment evidence to raise a genuine issue of material fact that the Lantek Parties had a duty to disclose material facts to Peck. Only Lantek was in a position to know that the payment structure of the Phase 3 Subcontract Price, including the initial payment for the Early Start Enabling (Partial Funding) and the remainder of the GMP paid by a document titled change order, would differ from the payment structure for the Phase 1 Subcontract. (4 CR 1439-40, 4 CR 1678-87). The Lantek Parties excluded "change orders" from the Settlement Agreement, to give Peck the false impression that change order would not relate to the original scope of work where he would be entitled to 10%, but an initial funding of an addition to the original scope of work based on the industry meaning of the term change order. (4 CR 1680-81). Peck produced competent summary judgment evidence to raise a fact issue as to the Lantek Parties' duty to disclose material facts to him.

c. **The Lantek Parties failed to disclose material facts to Peck, who was ignorant of the facts and did not have an equal opportunity to discover them.**

As stated above, the Lantek Parties failed to disclose to Peck complete information concerning the funding structure for Phase 3 of the Subcontract. (4 CR

69

1680-81). Peck did not have the means to discover that information, as he did not have equal access to it. (4 CR 1678-87). He was no longer an owner of the company when the Settlement Agreement was signed, and he was no longer involved in any respect with the project prior to the award of the Phase 2 Subcontract that was the first to add an early start, partial funding component. (4 CR 1680-81). Peck has presented sufficient summary judgment evidence to raise a genuine issue of material fact as to whether the Lantek Parties failed to disclose material facts to Peck and as to whether Peck was ignorant of the facts and did not have an equal opportunity to discover them.

**d.** **The Lantek Parties intended Peck to act or to refrain from acting.**

"Slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent." *Spoljaric,* 708 S.W.2d at 435. Here, looking to the circumstances surrounding the parties' execution of the Settlement Agreement, Peck has presented sufficient summary judgment evidence to raise a genuine issue of material fact as to whether the Lantek Parties intended Peck to refrain from obtaining complete information on the funding for Phase 3 of the Subcontract. (4 CR 1437-41, 1680-81). The Lantek Parties knew that Peck was under a false impression of how the funding would be made, that Peck was no longer in a position to determine the complete information

regarding the funding, yet allowed Peck to remain under a false impression. (4 CR 1678-87).

### e. Peck relied on the Lantek Parties' nondisclosure and was injured.

As shown in the fraud section above, Peck relied on the Lantek Parties' nondisclosure and was injured. (4 CR 1678-87). *See supra* Section A(2)(e) and A(2)(f). Although the Lantek Parties were in a position to know that the payment structure of the Phase 3 Subcontract would differ from the payment structure for the Phase 1 Subcontract, they inserted "initial" and "excluding change orders" to the Settlement Agreement, without informing Peck of the unusual payment structure used for the Phase 2 Subcontract. (4 CR 1680-81). The Lantek Parties' failure to provide all the information to Peck left Peck with the false impression that initial contract price and excluding change orders only clarify that Peck would receive 10% of the amount awarded for the original scope of work, rather than additions to that original scope of work. (4 CR 1439, 1680-81).

### CONCLUSION AND PRAYER

In conclusion, this Court must affirm the trial court's summary judgment in favor of Peck and affirm the trial court's denial of Lantek's motion for partial summary judgment because the trial court properly construed the Settlement Agreement and determined that Peck was entitled to 10% of the full amount initially awarded to Lantek in the Phase 3 Subcontract for the original scope of work.

71

Additionally, the trial court correctly awarded attorney's fees as such amounts were stipulated and proper under Chapter 38 of the Texas Civil Practice & Remedies Code. Thus, the trial court's judgment should be affirmed for these reasons. However, the trial court erred in granting the Lantek Parties' summary judgment on Peck's fraud counterclaims. To the extent the Court reverses the summary judgment on breach of contract, this Court should also reverse and remand in part as to Peck's fraud counterclaims.

Accordingly, Peck respectfully requests that this Court affirm the trial court's award of summary judgment in favor of Peck, affirm the trial court's denial of Lantek's motion for partial summary judgment, award Peck the additional appellate attorneys' fees set forth in the trial court's final judgment and award Peck his costs on appeal. Peck also requests that the Court reverse in part the trial court's judgment as to the award of summary judgment in favor of the Lantek Parties on Peck's fraud counterclaims. Peck further requests such other relief to which he may be justly and equitably entitled.

By: /s/ *Katherine Elrich*
**KATHERINE K. ELRICH**
Texas Bar No. 24007158
kelrich@cobbmartinez.com
**KELLY B. GIBBONS**
Texas Bar No. 24055548
kgibbons@cobbmartinez.com

**COBB MARTINEZ WOODWARD PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, Texas  75201
(214) 220-5237 Telephone
(214) 220-5287 Facsimile

—and—

**BOWDICH & ASSOCIATES, PLLC**

John W. Bowdich
State Bar No. 00796233
jbowdich@bowdichlaw.com
10440 N. Central Expy., Suite 1540
Dallas, Texas 75231
(214) 307-9500 Telephone
(214) 307-5137 Facsimile

*Attorneys for Appellee/Cross-Appellant*

73

**RULE 9.4 CERTIFICATE OF COMPLIANCE**

This document complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of TEX. R. APP. P. 9.4(i), if applicable, because it contains 13,449 words, excluding any parts exempted by TEX. R. APP. P. 9.4(i)(1). Additionally, this Brief complies with the word count ordered by this Court pursuant to the parties' Agreed Briefing Schedule. More specifically, the portion of the Brief pertaining to Appellee's Brief contains 8,531 words. The portion of the Brief relating to Cross-Appellant's Brief contains 4,918 words.

*/s/ Katherine Elrich*
**KATHERINE ELRICH**

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing was served via e-service on the following counsel of record on December 20, 2017.

**Via Electronic Filing/Service**
Byron Henry
byron.henry@solidcounsel.com
Andrea K. Bouressa
andrea.bouressa@solidcounsel.com
SCHEEF & STONE, L.L.P.
2600 Network Boulevard, Suite 400
Frisco, Texas 75034
*Attorneys for Appellant/Cross-Appellees*

*/s/ Katherine Elrich*
**KATHERINE ELRICH**

# APPENDIX

Tab A:     Order Granting Plaintiffs' Motion for Evidence and Traditional Partial
           Summary Judgment (4 CR 1828)

Tab B:     Final Judgment (4 CR 1832-1835)

# TAB A

141-286694-16

| | | |
|---|---|---|
| LANTEK COMMUNICATIONS, INC.; | § | IN THE DISTRICT COURT |
| LANTEK COMMUNICATIONS II, LLC, | § | |
| LANTEK AUDIO VIDEO | § | |
| COMMUNICATIONS, LLC; DOMINGO | § | 141ST JUDICIAL DISTRICT |
| MAYORGA and ESTER MAYORGA | § | |
| | § | |
| V | § | |
| | § | |
| HAMILTON PECK | § | TARRANT COUNTY, TEXAS |

## ORDER GRANTING PLAINTIFFS' MOTION FOR EVIDENCE AND TRADITIONAL PARTIAL SUMMARY JUDGMENT

The Court considered Plaintiffs' Motion for No Evidence and Traditional Partial Summary Judgment (the "Motion") and Defendant Hamilton Peck's Response to Plaintiffs' Motion for No Evidence and Traditional Partial Summary Judgment and finds that, after consideration of all competent summary judgment evidence presented, the papers and pleadings on file, and the arguments of counsel, the Motion should be, in all things GRANTED.

IT IS THEREFORE ORDERED that the Motion is GRANTED.

SIGNED ON May 12, 2017.

_____
THE HONORABLE JOHN P. CHUPP
JUDGE, 141ST JUDICIAL DISTRICT COURT


E-MAILED
5/15/17

1828

# TAB B

FILED
TARRANT COUNTY
6/29/2017 2:50 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 141-286694-16

| | | |
|---|---|---|
| LANTEK COMMUNICATIONS, INC.; | § | IN THE DISTRICT COURT OF |
| LANTEK COMMUNICATIONS II, LLC, | § | |
| LANTEK AUDIO VIDEO | § | |
| COMMUNICATIONS, LLC; DOMINGO | § | |
| MAYORGA and ESTER MAYORGA, | § | |
| *Plaintiffs,* | § | 141ˢᵗ JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| HAMILTON PECK, | § | |
| *Defendant.* | § | TARRANT COUNTY, TEXAS |

## FINAL JUDGMENT

The Court, having granted *Defendant Hamilton Peck's Traditional and No Evidence Motion for Partial Summary Judgment* pursuant to the *Order Granting Partial Summary Judgment* signed on May 12, 2017 (the "Order on Defendant's MSJ"); having granted Plaintiffs' Motion for No Evidence and Traditional Partial Summary Judgment pursuant to the *Order Granting Plaintiffs' Motion for* [sic] *Evidence and Traditional Partial Summary Judgment* signed on May 12, 2017 (the "Order on Plaintiff's MSJ"); and upon consideration of the *Stipulation and Rule 11 Agreement* filed by Defendant Hamilton Peck ("Defendant") and Plaintiff Lantek Communications, Inc. ("Plaintiff"), finds that the Court has jurisdiction over the parties and this cause, that Defendant is the prevailing party, and the Court makes the following orders:

IT IS, ORDERED, ADJUDGED and DECREED that:

1.  Judgment be entered in favor of Defendant Hamilton Peck and against Plaintiff Lantek Communications, Inc.;

2.  Defendant shall have and recover from Plaintiff actual damages in the amount of $547,529.65, less the offset amount of $40,215.50 for payments that Lantek has already made to Peck, conditioned upon the checks comprising such offset amount being honored so that such funds are actually received by Peck;

FINAL JUDGMENT





3. Defendant shall have and recover attorneys' fees from Plaintiff in the amount of $111,428.50 for attorney's fees through this Judgment, as well as the following conditional awards of attorneys' fees:

a. $1,500.00 for each time Plaintiff files any post-judgment, pre-appeal, motion in this Court seeking to alter the Order on Defendant's MSJ or this Judgment, that increases to $10,000.00 should Plaintiff set any such motion for hearing or should Defendant file any response such motion, that does not result in a material modification to such Order or Judgment or a new trial;

b. $35,000.00 in the event Plaintiff files any Notice of Appeal with the Court of Appeals that does not result in reversal of the judgment rendered herein;

c. $5,000.00 in the event Defendant responds to a motion for rehearing or reconsideration in the Court of Appeals that does not result in a reversal of the judgment rendered herein;

d. $10,000.00 in the event Peck makes or responds to Plaintiff's petition for review to the Supreme Court of Texas, should same be filed;

e. $30,000.00 in the event the Supreme Court of Texas accepts Plaintiff's petition for review or appeal, but does not result in reversal of the judgment rendered herein;

f. $5,000.00 in the event Defendant responds to a motion for rehearing or reconsideration in the Supreme Court of Texas that does not result in a reversal of the judgment rendered herein; and

g. $2,500.00 for each writ of execution, writ of garnishment or turnover order for collection of any judgment, in whole or in part, that is obtained by Defendant.

The Court takes judicial notice of, and finds that all of the attorneys' fees awarded herein are usual, reasonable and necessary.

IT IS FURTHER ORDERED that Defendant shall recover pre-judgment interest from Plaintiff in the amount of $27,652.20 through June 29, 2017, plus $69.4951 from each day from June 29, 2017 until the Judgment is signed.

IT IS FURTHER ORDERED that Defendant shall recover all of his court costs from Plaintiff in the amount of $9,721.34.

IT IS FURTHER ORDERED that Defendant shall have and recover post-judgment interest on all sums awarded herein, except for conditional attorney's fees' awards, of five percent (5.0%) compounded annually from the date of this Judgment, set forth below until paid.

IT IS FURTHER ORDERED that Defendant shall have and recover post-judgment interest on conditional attorney's fees detailed above of five percent (5.0%) compounded annually from the following dates until paid, for the corresponding subsections of section 3 above:

a. The date the trial court denies any post-judgment motion, or the date the motion is denied by operation of law, whichever is earlier;

b. The date of the court of appeals' judgment for an appeal to the court of appeals;

c. The date of the denial of a motion for rehearing for fees related to responding to a motion for rehearing;

d. The date the petition for review is denied for fees related to responding to a petition for review;

e. The date of the Supreme Court's judgment for fees related to the affirmance of the judgment after a petition for review is granted;

f. The date the Supreme Court denies the motion for rehearing for fees related to responding to a motion for rehearing; and

g. The date any such writ issues, or order is granted.

All writs and process for the enforcement and collection of this judgment may issue as necessary.

IT IS FURTHER ORDERED, that this judgment is a final and appealable judgment disposing of all parties and claims. Any relief not expressly provided herein, is denied.

SIGNED on this **30** day of June, 2017.

_____
JUDGE PRESIDING

FINAL JUDGMENT

1834